UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No.: 05-54-KAJ |
| | ) | |
| ERIC DAVIS, | ) | |
| | ) | |
| Defendant. | ) | |

**OPENING MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Christopher S. Koyste, Esquire
Assistant Federal Public Defender
704 King Street, Suite 110
Wilmington, Delaware 19801
Attorney for Defendant Eric Davis

DATED: November 29, 2005

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      I.      Patrolman Sheeky Illegally Seized Mr. Davis by Questioning Mr. Davis
           Outside of the Scope of the Traffic Stop. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      II.     Mr. Davis Invoked His <u>Miranda</u> Right to Remain Silent After His Rights
           Were Read to Him by Patrolman Sheeky. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      III.    The Subsequent Interrogation of Mr. Davis by Agent Hughes Violated <u>Miranda</u>
           Because Mr. Davis Invoked His Right to Remain Silent and Did Not Later
           Initiate Conversation With Law Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . 10

      IV.    Special Agent Hughes Impermissibly Elicited Statements From Mr. Davis By
           Creating a Coercive Environment, Making the Subsequent <u>Miranda</u> Waiver
           Involuntary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## TABLE OF AUTHORITIES

<u>CASES</u>                                                                                      <u>PAGES</u>

<u>Arizona v. Mauro</u>, 481 U.S. 520 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 16

<u>Berkemer v. McCarty</u>, 468 U.S. 420 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

<u>Colorado v. Connelly</u>, 479 U.S. 157 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

<u>Davis v. U.S.</u>, 512 U.S. 452 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

<u>Delaware v. Prouse</u>, 440 U.S. 648 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 7

<u>Edwards v. Arizona</u>, 451 U.S. 477 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

<u>Hayes v. Florida</u>, 470 U.S. 811 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

<u>Illinois v. Caballes</u>, 125 S. Ct. 834 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

<u>Kirk v. Carroll</u>, 243 F. Supp. 2d 125 (D. Del. 2003) . . . . . . . . . . . . . . . . . . . . . . .  9

<u>Katz v. United States</u>, 389 U.S. 347 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

<u>Michigan v. Mosley</u>, 423 U.S. 96 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Passim

<u>Missouri v. Seibert</u>, 542 U.S. 600 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

<u>Pennsylvania v. Muniz</u>, 496 U.S. 582 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

<u>Rhode Island v. Innis</u>, 446 U.S. 291 (1980) . . . . . . . . . . . . . . . . . . . . . . . . .  13, 14, 16

<u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . .  6

<u>Stansbury v. California</u>, 511 U.S. 311 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

<u>United States v. Hurst</u>, 228 F.3d 751 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . .  9

<u>United States v. Jackson</u>, 2005 U.S. App. LEXIS 20030 (3d Cir. Sept. 15, 2005) . . . . . . . .  14

<u>United States v. Jacobsen</u>, 466 U.S. 109 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

<u>United States v. Johnson</u>, 63 F.3d 242 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . .  7

United States v. Mercedes, 69 Fed. Appx. 38 (3d Cir. Feb. 4, 2003) . . . . . . . . . . . . . . . . . 10

United States v. Naranjo, 426 F.3d 221 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Roberson, 90 F.3d 75 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Swint, 15 F.3d 286 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Tigget, 2004 U.S. Dist. LEXIS 2421 (D. Del., January 29, 2004) . . . . . . 9, 11

United States v. Walton, 10 F.3d 1024 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Williams, 413 F.3d 382 (3d Cir 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Young, 2005 U.S. Dist. LEXIS 25010 (E.D. Pa October 25, 2005) . . . . . . . 9

Withrow v. Williams, 507 U.S. 680 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Wong Sun v. United States, 371 U.S. 471 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 19

## STATEMENT OF FACTS

On Wednesday, April 20, 2005, at approximately 12:49 a.m., Mr. Eric Lamont Davis was driving a silver GMC Yukon Denali bearing the Virginia tag JTN2438, southbound on I-295 near the toll plaza immediately south of the Delaware Memorial Bridge (T[1]-5). Patrolman Sheeky of the Delaware River and Bay Authority Police was in this area and saw that the left front headlight of the vehicle was not operational. Id. Patrolman Sheeky, who drove behind the vehicle as it traveled (southbound on I-295) in the direction of Route 9, activated his emergency equipment. Id. The vehicle immediately pulled over onto the left shoulder of southbound I-295 (T-5, 25).

Patrolman Sheeky left his vehicle and approached the driver's side of the vehicle. Id. He advised the driver why he was stopped and asked for documentation in relation to the automobile and the driver. Id. Mr. Davis gave Patrolman Sheeky his driver's license and registration for the vehicle (T-6, 36). Patrolman Sheeky next began to question Mr. Davis regarding the purpose of his trip, where he was going to, where he was coming from, and the identity of his passenger (T-6). Mr. Davis answered all of Patrolman Sheeky's questions (T-6-7). Mr. Davis told Patrolman Sheeky that his passenger was Marlon Pettaway and that they were music producers who had taken a two day music trip to New York (T-6-7, 34).

Even though the purpose of the traffic stop was in relation to a broken headlight, Patrolman Sheeky further interrogated Mr. Davis, asking him specifically where in New York he had been (T-6). Mr. Davis told Patrolman Sheeky that he had been in the East Side of Brooklyn, New York, possibly near Pickwick Street, although he was not certain of the exact address (T-6, 7).

---

[1] "T" refers to the transcript of the October 4, 2005 evidentiary hearing. "VT" (video transcript) refers to Defense Exhibit 1 submitted at the suppression hearing which is a transcript of the audible portions of Special Agent's Hughes' April 20, 2005 interrogation of Mr. Davis at the Delaware River and Bay Authority headquarters.

Patrolman Sheeky noted at the October 4, 2005 evidentiary hearing that when he asked Mr. Davis a question, that he would repeat the question before he would answer it (T-7). Patrolman Sheeky looked into the vehicle and could not see any luggage (T-30). He testified that the vehicle had a tinting on the window which was darker in the rear windows (T-30). Patrolman Sheeky also noted that he could not see through the windows to the floor of the rear seating area of the vehicle (T-31). However, he did not look through the passenger side window as it was next to the highway (T-35-36).

Patrolman Sheeky returned to his patrol car and verified that Mr. Davis' driver's license was valid and determined that there were not any warrants for Mr. Davis or Mr. Pettaway (T-8). While sitting in his car, Patrolman Sheeky noticed that Mr. Davis was watching him in the side-view mirror of his vehicle (T-8). Patrolman Sheeky determined that he would write a warning, and not an actual ticket for the non-operational front headlight (T-8-9). He called Master Corporal Winch for assistance in that he desired to search the vehicle (T-39). Patrolman Sheeky's claimed basis for wanting to search the vehicle was because he was not sure where Mr. Davis and Mr. Pettaway came from, he could not observe any luggage in the vehicle, Mr. Davis' repeated his questions before answering, and Mr. Davis watched Patrolman Sheeky in the side-view mirror (T-10-11, 40).

Patrolman Sheeky reapproached Mr. Davis' vehicle and asked him to step out so that he could explain the warning to him (T-10, 41, 42). Mr. Davis did so, signed the warning, and was handed his copy and his driver's license and registration card (T-10, 42). Patrolman Sheeky then asked Mr. Davis if he had a minute to answer a few questions. He did not tell Mr. Davis that he was free to go (T-10-11, 42, 45, 46). Mr. Davis complied, and Patrolman Sheeky questioned him as to whether he had anything illegal in his vehicle, to which Mr. Davis replied that he did not (T-10-12, 43, 44). For a minute or two, Patrolman Sheeky re-questioned Mr. Davis regarding the statements that he made

2

at the time that he obtained his driver's information (T-45, 47).  Mr. Davis responded with the "same information" that he previously gave.  Id.  Patrolman Sheeky then asked Mr. Davis if he could take a look in his vehicle, and asked him to read and sign a consent to search form (T-12-13, 46).  Mr. Davis signed the consent to search form at approximately 1:05 a.m. (T-13).  Patrolman Sheeky performed a Terry pat-down of Mr. Davis (T-14) even though he cited no facts that would indicate that Mr. Davis was armed.  Patrolman Sheeky then went to the passenger side of the vehicle and asked Mr. Pettaway to exit the vehicle and then patted him down for weapons (T-14).

Master Corporal Winch watched Mr. Davis and Mr. Pettaway as Patrolman Sheeky searched the vehicle (T-15).  While searching the automobile, under the front passenger seat, Patrolman Sheeky found two clear baggies which contained numerous pellet-shaped objects that he believed were heroin (T-15-16).  Patrolman Sheeky immediately arrested Mr. Pettaway and told Master Corporal Winch to arrest Mr. Davis (T-16, 48).  The officers then brought both of them to the front of Patrolman Sheeky's patrol car and read them Miranda[2] rights from a card (T-16-18, 48-50).  Mr. Davis responded by noting that he was aware of his rights, but when asked if he wished to talk to Patrolman Sheeky, he replied "I'm not sure if I should, I'm really not." (T-18, 49)  Neither Mr. Davis nor Mr. Pettaway waived their Miranda rights.

Patrolman Sheeky treated Mr. Davis' statement about not being sure that he wished to talk to law enforcement as if he had said that he did not wish to make a statement (T-49-51).  Patrolman Sheeky asked Mr. Davis no further interrogation questions while transporting him to the Delaware River Bay Authority headquarters, nor while he was held at this facility (T-50).  Patrolman Sheeky did ask Mr. Davis "pedigree questions" because Sheeky understood that he was permitted under the

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

Constitution to ask these type of paperwork processing questions (T-51).  Although Patrolman Sheeky was only purportedly asking biographical questions, he placed Mr. Davis in an interview room with recording equipment at 2:00 a.m.  (T-52)  Mr. Davis remained in this room for approximately 6 and ½ hours.

Sometime between 2:30 to 3:00 a.m. that morning, Patrolman Sheeky had a telephone conversation with Special Agent David Hughes of the DEA regarding the traffic stop of Mr. Davis (T-20, 21).  During the suppression hearing, Patrolman Sheeky frankly described how he told Agent Hughes that he read Mr. Davis his <u>Miranda</u> warnings and "(t)hat [Mr. Davis] wasn't sure what he wanted to do, ... so I didn't question him anymore about anything related to the traffic stop."  (T-20, 57)  Agent Hughes testified that during the telephone conversation with Patrolman Sheeky, that Sheeky did not say to him that Mr. Davis was unsure that he wished to make a statement (T-75).  Agent Hughes claimed that Patrolman Sheeky "told me that he did not invoke his <u>Miranda</u> rights."  (T-75)

At approximately 9:00 a.m., Agent Hughes initiated a custodial interrogation of Mr. Davis (T-21-22).  Agent Hughes began the process by asking Mr. Davis numerous questions in relation to his background, family members, children, his home, cellular telephone numbers, and his current residence (T-62, 76, VT-1-3).  Agent Hughes chose not to begin by advising Mr. Davis of his <u>Miranda</u> rights, even though his goal was to have Mr. Davis waive his <u>Miranda</u> rights (T-76).  Agent Hughes then made numerous statements to Mr. Davis about his criminal record, the fact that over 100 grams of heroin was found in his vehicle, federal criminal charges would be filed against him requiring a minimum mandatory sentence of 5 years of incarceration, and that based on prior felony convictions, Mr. Davis may be a "career offender" (T-80, VT-4).  Agent Hughes then, just seconds before advising Mr. Davis of his <u>Miranda</u> rights, told Mr. Davis that he should think about his wife

4

and daughter and how they will be separated (VT-4).

Agent Hughes then read Mr. Davis his <u>Miranda</u> rights from a standard DEA form (VT-5). Immediately after advising Mr. Davis of his <u>Miranda</u> rights, Agents Hughes chose not to ask Mr. Davis if he wished to waive those rights, but instead made additional statements to Mr. Davis (VT-5). Agent Hughes told Mr. Davis that he contacted a prosecutor with the United States Attorney's Office and that if Mr. Davis decided to cooperate, this would be told to the prosecutor. <u>Id</u>. Agent Hughes then told Mr. Davis that there "is a very small window of opportunity which you have to try and help yourself out." <u>Id</u>. Agent Hughes told Mr. Davis that 95% plus of defendants "don't get bail in the federal system" and that he did not believe that he would get bail. <u>Id</u>. Only after making this statement did Agent Hughes ask Mr. Davis to sign a waiver of <u>Miranda</u> form, to which he complied (VT-5-6). During the interrogation that occurred after the signing of the <u>Miranda</u> waiver, Mr. Davis made numerous statements which the government may try to use against him at trial.

**ARGUMENT**

> **I.     Patrolman Sheeky Illegally Seized Mr. Davis by Questioning Mr. Davis Outside of the Scope of the Traffic Stop.**

Mr. Davis asserts that Patrolman Sheeky illegally seized Mr. Davis by questioning him about facts outside of the scope of the traffic stop. After approaching Mr. Davis' vehicle, Patrolman Sheeky questioned him where he came from and the purpose of his trip (T-6-7). After Mr. Davis answered by explaining how he was in Brooklyn for a music production trip, Patrolman Sheeky continued to question Mr. Davis for more specific information in relation to where in Brooklyn he had been. <u>Id</u>. The Defense asserts that this questioning was conducted in an attempt to elicit incriminating responses in an environment where Mr. Davis' liberty was curtailed by Patrolman

Sheeky, in that Mr. Davis was not free to leave. This questioning was not reasonably related to the traffic stop and constitutes a seizure that is unsupported by probable cause.

Mr. Davis answered all of Patrolman Sheeky's questions and produced his driver's license and automobile registration card. Even though Patrolman Sheeky confirmed Mr. Davis' information, he decided to further question Mr. Davis after giving him a written warning for the headlight (T-6-8). He asked Mr. Davis to step out his automobile and then had Mr. Davis sign the written warning (T-10). He returned his driver's license and registration, but did not tell him that he was free to leave (T-10, 46). Patrolman Sheeky then asked Mr. Davis if he would answer additional questions while he was still outside of his vehicle (T-10). He then continued to illegally seize Mr. Davis by further questioning him outside of the scope of the traffic stop by repeating the same questions that he previously asked of him (T-45, 47).

The Fourth Amendment of the Constitution prohibits law enforcement from unreasonable searches and seizures. It is well-settled "that a search conducted without a warrant issued upon probable cause is *per se* unreasonable subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). Where no probable cause and no warrant exist for a subsequent search and seizure, suppression of any evidence recovered will be required. See United States v. Roberson, 90 F.3d 75 (3d Cir. 1996); Hayes v. Florida, 470 U.S. 811 (1985).

The United States Supreme Court has stated that "(i)t is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, 125 S. Ct. 834, 836 (2005) (citing United States v. Jacobsen, 466 U.S. 109, 124 (1984)). The Supreme Court in Delaware v.

Prouse, 440 U.S. 648, 662 (1979), recognized that "(a)n individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to governmental regulation." The Supreme Court additionally noted that "(t)he Fourth and Fourteenth Amendments are implicated in this case because stopping an automobile and detaining its occupants constitutes a 'seizure' within the meaning of those Amendments, even though the purpose of the stop is limited and the resulting detention is quite brief." Id. at 653.

The Defense asserts Patrolman Sheeky's repeated questioning of Mr. Davis concerning his trip to New York violated the Fourth and Fourteenth Amendments to the Constitution in that it increased the duration and the level of intrusiveness of the seizure. Mr. Davis asserts that at the moment the questioning by Patrolman Sheeky first diverged from the traffic stop to unrelated matters, Patrolman Sheeky illegally seized Mr. Davis in an attempt to use the traffic stop to try to develop probable cause and/or reasonable suspicion of other criminal activity. The unrelated questioning took place while Mr. Davis was not yet released by Patrolman Sheeky. Furthermore, the fact that Mr. Davis continued to be seized while Patrolman Sheeky asked his unrelated questions cannot be excused as a seizure supported by exigent circumstances and probable cause.

United States v. Johnson, 63 F.3d 242, 247 (3d Cir. 1995) draws focus upon a police officer's basis for increasing the scope of a traffic stop. The Third Circuit, in Johnson, directs that "(t)o justify a greater intrusion unrelated to the traffic stop, the totality of the circumstances known to the police officer must establish reasonable suspicion or probable cause to support the intrusion." Id. The Third Circuit additionally noted in Johnson that "(c)learly a traffic stop is not 'carte blanche' for an officer to engage in other unjustified action." Id. However, that is exactly what Patrolman Sheeky did. In this case, there was no testimony that established any reasonable suspicion of criminal activity at the

7

time that he increased the intrusive nature of the stop by repeatedly questioning Mr. Davis about his trip to New York.

Furthermore, Mr. Davis continued to be seized and interrogated by Patrolman Sheeky even after his driver's license was returned and the written warning form was signed. To determine whether and exactly when an individual is in custody "the only relevant inquiry is how a reasonable man in the suspects shoes would have understood his position." Stansbury v. California, 511 U.S. 311, 322 (1994), (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)). When Patrolman Sheeky approached Mr. Davis' car he asked him to step out of his vehicle, which showed his control over Mr. Davis (T-10, 41). Furthermore, Patrolman Sheeky called for assistance and two police officers were at the scene, showing the increased control that law enforcement had over the situation (T-14, 88). Although Mr. Davis agreed to answer additional questions of Patrolman Sheeky after signing the warning, such an agreement was only a submission to the authority of the police officer and was not "knowing" because Mr. Davis was not informed that he was free to leave (T-46). See United States v. Williams, 413 F.3d 382, 387-89 (3d Cir 2005). Thus, Mr. Davis continued to be seized by Patrolman Davis. The unreasonable detention continued when Patrolman Sheeky again interrogated Mr. Davis with the same questions that he previously asked of him (T-43-45, 47).

This Court must find that, at various times, Patrolman Sheeky unreasonably detained Mr. Davis. As of the first moment that Mr. Davis was illegally detained, any evidence obtained after Patrolman Sheeky violated the Fourth and Fourteenth Amendments must be suppressed as a violation of the fruit of the poisonous tree doctrine. Wong Sun v. United States, 371 U.S. 471 (1963).

## II.    Mr. Davis Invoked His <u>Miranda</u> Right to Remain Silent After His Rights Were Read to Him by Patrolman Sheeky.

The Fifth Amendment of the U.S. Constitution guarantees that no person will be forced to be a witness against himself in a criminal proceeding.  <u>See</u> U.S. Const. amend VI; <u>see</u> <u>also</u> <u>United States v. Tigget</u>, 2004 U.S. Dist. LEXIS 2421 (D. Del., January 29, 2004).  In observing this Fifth Amendment protection, the United States Supreme Court created the <u>Miranda</u> warnings, which require law enforcement officials, prior to custodial interrogation, to inform a suspect that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed." <u>Id</u>.

In relation to an individual's right to remain silent and not to be asked incriminating questions, the Supreme Court has stated that an interrogation must cease if an individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent. <u>Miranda</u>, 384 U.S. at 473-74.  A district court must use an objective test to determine whether a suspect invoked his right to remain silent.  <u>Kirk v. Carroll</u>, 243 F. Supp. 2d 125, 133 (D. Del. 2003); <u>see</u> <u>also</u> <u>Davis v. United States</u>, 512 U.S. 452, 459 (1994).  Recognizing this objective standard, the District Court for the Eastern District of Pennsylvania found that a suspect "must 'articulate his right to remain silent sufficiently clearly that a reasonable police officer would, under the circumstances, perceive it as such.'" <u>United States v. Young</u>, 2005 U.S. Dist. LEXIS 25010 at *4, 5 (E.D. Pa. October 25, 2005) (detective understood defendant's refusal to sign anything as an effective invocation of the right to remain silent and that any additional interrogation was therefore inappropriate) (citing <u>Davis</u>, 512 U.S. at 459; <u>see</u> <u>also</u> <u>United States v. Hurst</u>, 228 F.3d 751, 759 (6th Cir. 2000)).

After Patrolman Sheeky informed Mr. Davis of his <u>Miranda</u> rights, Mr. Davis responded by

saying that he understood his rights and was not sure that he wished to make any statements (T-18, 49, 50). Mr. Davis' statement was treated by Patrolman Sheeky as an invocation of his right to remain silent, in that Patrolman Sheeky never asked Mr. Davis any incriminating questions after this statement (T-49-50). In fact, Patrolman Sheeky testified at the suppression hearing that he "erred on the side of caution and just did not ask him anything" (T-50, 51). However, Patrolman Sheeky did state that, after Mr. Davis was arrested and advised of his rights, that he only asked questions of the type that would be permitted after a defendant has invoked his <u>Miranda</u> protections, that is, routine "pedigree" processing questions (T-51). <u>See</u> <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 601 (1990). Thus, DEA Agent Hughes' subsequent interrogation of Mr. Davis after he invoked his right to remain silent violated <u>Miranda</u> and the Fifth Amendment of the United States Constitution and requires the suppression of all evidence obtained as a result of the interrogation.

### III.    The Subsequent Interrogation of Mr. Davis by Agent Hughes Violated <u>Miranda</u> Because Mr. Davis Invoked His Right to Remain Silent and Did Not Later Initiate Conversation With Law Enforcement.

If a court finds that a person's invocation of his right to remain silent was one that a reasonable police officer in the circumstances would have understood as a proper invocation of a right to remain silent, then the interrogation must cease. <u>Miranda</u>, 384 U.S. at 473-74. However, a defendant may subsequently waive his <u>Miranda</u> rights if he initiates conversation with the police. <u>Edwards v. Arizona</u>, 451 U.S. 477, 486 n.9 (1981). A defendant may reopen conversation with police when he, "without prompting," asks questions surrounding the arrest, and "the facts, circumstances, and possible penalties of [his] case." <u>United States v. Mercedes</u>, 69 Fed. Appx. 38, 39 (3d Cir. Feb. 4, 2003) (unpublished).

Furthermore, if a suspect invokes only his right to remain silent and not his right to the

presence of counsel, then reinterrogation by law enforcement may be permissible when the defendant's right to stop questioning was "scrupulously honored." Tigget, 2004 U.S. Dist. LEXIS 2421 at 13, (citing, Michigan v. Mosley, 423 U.S. 96 (1975)).  A court looks to the surrounding circumstances of a case to determine whether a police officer scrupulously honored a defendant's request to remain silent.  Id.

The defendant in Mosley was read his Miranda rights and then stated that he did not want to answer any questions about a series of robberies in which he was implicated as a suspect.  The detective promptly ceased questioning.  About two hours later, another detective arrived and again provided the defendant with his Miranda rights before questioning him about another crime.  The Supreme Court found that the police had scrupulously honored the defendant's right to remain silent because the first police officer immediately ceased questioning, and questioning was resumed by a different police officer, for a different crime, in a different situation, and only after a significant passage of time.

The record of this case clearly shows that Mr. Davis did not reopen conversation with law enforcement after he had invoked his Miranda rights.  Mr. Davis did not have any additional conversations with Patrolman Sheeky after he initially invoked his Miranda rights at the time of his arrest.  Mr. Davis did not ask to speak to Patrolman Sheeky or anyone of law enforcement.  It was Agent Hughes who initiated conversation with Mr. Davis when he entered Mr. Davis' holding room.  Thus, in compliance with Mosley, this Court must hold that law enforcement failed to "scrupulously honor" Mr. Davis' invocation of his right to remain silent and suppress all evidence obtained as a result of Agent Hughes conduct.

11

IV.    **Special Agent Hughes Impermissibly Elicited Statements From Mr. Davis By Creating a Coercive Environment, Making the Subsequent <u>Miranda</u> Waiver Involuntary.**

In the event that this Court holds that Mr. Davis did not invoke his <u>Miranda</u> rights when advised by Patrolman Sheeky, the Defense advances that Mr. Davis' waiver of his <u>Miranda</u> rights given to Agent Hughes was involuntary under the totality of the circumstances due to the actions of Agent Hughes.

In 1966, the Supreme Court issued its landmark decision requiring that police, at the outset of every custodial interrogation, must advise a defendant of his constitutional right to remain silent and his right to the presence of retained or appointed counsel during the interrogation. <u>Miranda</u>, 384 U.S. at 469-473. The Supreme Court imposed these requirements because "incommunicado interrogation of individuals in a police-dominated atmosphere" is inherently coercive. <u>Id</u>. at 445. The Supreme Court noted that, "(u)nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free will." <u>Id</u>. at 458. <u>Miranda</u> announced a constitutional rule based on the Fifth Amendment of the United States Constitution.

A court looks to the "totality of the circumstances" to establish whether or not an officer's statements or questions created a coercive atmosphere that induced involuntary statements. <u>United States v. Walton</u>, 10 F.3d 1024, 1028-29 (3d Cir. 1993); <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986). A court may look to the following factors in order to determine the voluntariness of a defendant's statements under a totality of the circumstances approach: the length of the interrogation; the location of the interrogation; the continuity of the interrogation; the defendant's maturity; the defendant's level of education; the defendant's physical condition; the defendant's mental health; and

law enforcement's failure to advise the defendant of his Miranda rights.  See United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994) (citing Withrow v. Williams, 507 U.S. 680, 693-94 (1993)).  The Third Circuit recognizes that voluntariness "encompasses all interrogation practices likely to pressure a suspect to such an extent that he/she is precluded from making a free and rational decision about abandoning the protections of the Constitution and giving statements to police."  United States v. Naranjo, 426 F.3d 221, 227 (3d Cir. 2005) (citing, Miranda, 384 U.S. at 464-465).

The Supreme Court recognized, in Miranda, that police are trained to conduct interrogations in privacy in a room chosen by the interrogator.  In recognizing this, the Court stated, "privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on in the interrogation rooms."  Miranda, 384 U.S. at 448-449.  It also allows the interrogator to create and maintain an "atmosphere of domination."  Id. at 451.  Custodial interrogation tactics that "subjugate the individual to the will of his examiner" and produce a "compelled" confession (Id. at 457-458) include: "engendering fear;" incommunicado interrogation in a setting "cut off from the outside world" (Id. at 445); trickery (Id. at 453); and advising the defendant that he has a right to remain silent but suggesting that things will go better for the defendant if he does in fact talk to his interrogators (Id. at 453-454).

The purpose of the Miranda warnings is to dispel the atmosphere of coercion that "encompasses all interrogation practices which are likely to exert such pressure upon an individual as to disable him from making a free and rational choice."  Miranda, 384 U.S. at 464-65;  Rhode Island v. Innis, 446 U.S. 291, 310 (1980).  Pressure may also be exerted upon an individual by its "functional equivalent" or "any words or actions" that police should know are reasonably likely to cause an accused to make an incriminating response.  Innis, 446 U.S. at 299-301.  The Supreme

13

stated in <u>Arizona v. Mauro</u> that law enforcement's use of a 'psychological ploy' when "coupled with the 'interrogation environment,' was likely to 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self incrimination." <u>Arizona v. Mauro</u>, 481 U.S. 520, 526, 527 n.5 (1987); <u>Innis</u>, 446 U.S. at 299-301; <u>Miranda</u>, 384 U.S. at 457.

The Supreme Court has found that the <u>Miranda</u> rights do not extend to routine booking questions that are asked to secure biographical information necessary to complete booking or pretrial services. <u>Muniz</u>, 486 U.S. at 601. However, booking questions administered in a coercive atmosphere designed to elicit incriminatory admissions are not subject to this exception. <u>Id.</u> at 601 n.14; <u>United States v. Jackson</u>, 2005 U.S. App. LEXIS 20030 (3d Cir. Sept. 15, 2005) (unpublished).

The facts outlined during the evidentiary hearing show that Agent Hughes, an experienced law enforcement officer,[3] who has conducted over 100 interrogations, used psychological ploys, pressure and fear, to undermine Mr. Davis' voluntary decision-making process. Mr. Davis was placed in a holding room at the Delaware River and Bay Authority headquarters at approximately 2:00 a.m. (T-52) Agent Hughes arrived at headquarters at about 8:30 the following morning, some 6 hours after Mr. Davis arrived at headquarters (T-60). Agent Hughes entered the holding room and found Mr. Davis with his head down on his arm, (presumably) trying to sleep on a small desk in a room lit with a bright fluorescent light (T-72-73). The entire interrogation took place in an environment controlled by law enforcement.

Agent Hughes sat down across from Mr. Davis, placed a folder down on the desk very close to Mr. Davis that contained items including his pedigree information and criminal records (T-73-74).

---

[3] Special Agent Hughes has been with the Drug Enforcement Agency for 6 and ½ years after previously having served on the Maryland State Police (T-60, 72). Agent Hughes received training from both agencies in relation to the interrogation of suspects (T-72).

Agent Hughes did not immediately read Mr. Davis his <u>Miranda</u> rights. Agent Hughes tactically chose not to administer <u>Miranda</u> warnings and instead engaged Mr. Davis in conservation. The early stage of the conversation focused on "pedigree" questions which are not considered interrogation (VT-1-4). However, Agent Hughes crossed the line from permissible pedigree questions to interrogation when he asked Mr. Davis his cell phone number after already obtaining his home telephone number (VT-2, T-78-79). Agent Hughes admitted that he issues subpoenas for a defendant's cell phone numbers "the vast majority of the time," so the investigative purpose of this question is readily apparent (T-78). Furthermore, Agent Hughes admitted that the DEA's "personal history information" form does not have a category for cell phone numbers, which further supports the conclusion that such a question is not a permissible "pedigree" question (T-77-79). The question as to Mr. Davis' cell phone number was an incriminating one, requiring the advisement and waiver of <u>Miranda</u> rights in order for the answer to be admissible. As of the moment that Agent Hughes asked that question, he violated Mr. Davis' Fifth Amendment rights.

Agent Hughes gathered information that would not necessarily be incriminating, but which he could use as a psychological ploy to get Mr. Davis to agree to waive his <u>Miranda</u> rights and ultimately give incriminating statements. Agent Hughes asked questions about Mr. Davis' marriage, and learned that he and his wife were separated and living in difference residences (VT 1-3). Agent Hughes found out that Mr. Davis had a daughter (VT 3-4). Agent Hughes previously placed documents related to Mr. Davis' prior charges only 6 inches to a foot away from him (T-74). Although Agent Hughes did not yet advise Mr. Davis of his <u>Miranda</u> rights, he began talking about his prior convictions and the dire consequences of the federal charges that Mr. Davis was facing. Agent Hughes did so when he stated:

15

It's your criminal record here Mr. Davis and it doesn't look very positive.  Especially in reference to drug activity. Do you understand with the Federal Guidelines reading today that um with all enhancements.  Let me explain to you what happens to you in the Federal System here before we talk any further. Right now your looking at over a hundred grams in heroin and you're the registered owner of the vehicle with over a hundred grams of heroin in the car, ok. That's a minimum mandatory of 5 years so that's 5 to 40 years in the Federal System. So you start out at 5 years and every conviction you have it kinda goes up from there, alright.  You've got some felony convictions here which um, may or not, may or may not make you a career offender, I'm not sure. In Im looking at 12-3-92 you got a guilty of a felony possession with intent ah cocaine. Ah, looking at 1991, felony possession of cocaine with intent, right. In 1992 a felony.  (VT 4)

Agent Hughes made this statement to cause Mr. Davis to be  nervous and scared.  It was the type of statement that is the functional equivalent of interrogation since one would reasonably expect it produce a response that could either be incriminating, or place a suspect in a mode where he is already conversing, making it easier for a law enforcement officer to obtain a Miranda waiver and keep the interrogation moving forward.  See Mauro, 481 U.S. at 526, 527 n.5; Innis, 446 U.S. at 299-301; Miranda, 384 U.S. at 457.  Agent Hughes even admitted that telling a suspect that he could be facing a 5 year minimum mandatory could make them nervous and explained why he did this as wanting "to be truthful with the people that I sit down with." (T-79).  After Agent Hughes made the above statement, it resulted in Mr. Davis denying having a conviction that Agent Hughes indicated he had (VT-4).  Thus, Agent Hughes knew that the way that he was conducting this encounter was working in that he was "pressing Mr. Davis' buttons" and getting him to respond to the statements that Agent Hughes made prior to the advisement of Miranda warnings.

After Mr. Davis' denial of having a particular conviction, Agent Hughes followed that up by stating: "Eric Lamont Davis, correct date of birth o.k., this is you, this is your SBI Number based on the fingerprints so we're not mixed up with somebody else all right;" and "Um, this is just, uh your

Virginia record and it's not very good so you might want to look" (VT-4).  These statements were the functional equivalent of interrogation and caused Mr. Davis to remark that he has only one conviction (VT-4).

Agent Hughes next made a series of brief statements to further create an atmosphere of apprehension and fear in order to get Mr. Davis to continue speaking with him.  These statements were, once again, the functional equivalent of interrogation, made prior to any waiver of <u>Miranda</u> rights.  Agent Hughes stated:

> Well we _____ for this um alright, I know you were the driver of the vehicle and the owner of the vehicle ok. Officer Sheeky told me um, you know what's occurred here.  One thing you should know and definitely want to think about is uh you know, your family, your daughter, your wife.  I know you guys are separated and I am sorry to here that but um there's a lot of things you need to be thinking about right now. So here's what we are going to do.  I am going to formally advise you of your rights, ok.  (VT-4)

Agent Hughes made the above statements to cause Mr. Davis to think of his wife, his child, and the emotions surrounding his familiar relationships, instead of the <u>Miranda</u> rights that he would soon advise him of.  Agent Hughes did this because he understood, as would any reasonable person, that talking about Mr. Davis' family would create emotions that would make it more likely that Mr. Davis would waive his <u>Miranda</u> rights and continue to talk to Agent Hughes.

Agent Hughes then said, "it's 9:00 clock, A.M.  Today's date is April 20, 2005, you should be able to read this.  You can read right English, how far did you go in school?" (VT-4)  Mr. Davis replied by telling Agent Hughes that he attended the 12th grade but did not graduate (VT-5).  Agent Hughes then read Mr. Davis his <u>Miranda</u> rights (VT-5).  Rather than letting Mr. Davis decide for himself whether he wished to waive his rights and talk, Agent Hughes further increased the pressure by discussing the case, the difficulties of receiving bail in the federal system, the fact that he had

already spoken to the United States Attorney's Office, as well as his own personal opinion that Mr.

Davis would not receive bail from the Magistrate Judge (VT-5).  Before Agent Hughes asked Mr.

Davis if he wished to waive his <u>Miranda</u> rights by signing a written waiver, he continued to make

statements that are the functional equivalent of interrogation.  Agent Hughes  stated:

> Now with all that being said. One thing I want to say to you is I've made contact with the United States Attorneys Office, the prosecutor o.k.  Ah, based upon what you tell me here today. Um is going to way um upon the way what we do on how we proceed from here.  What I mean by that is um again  no promises can be made and no threats can be made to you, but the bottom line is this, If you are cooperative individual your cooperation will be relayed to the United State Attorney's  Office specifically the prosecutor.  Eric look at me while I am talking to you.  This is a very small window of opportunity which you have to try and help yourself out ok.  But its awful small because once you go through the formal process, the Federal process o.k. you are going to be incarcerated.  I would say probably 95% plus don't get bail in the Federal System, alright and that's just because of the nature of the crime and looking at your prior criminal history, and what you had in the vehicle, I'm going to, I'm going to bet that you won't get bail.  Ok.  I'm not saying that you won't because I'm not the judge.  Alright, I'm not the  magistrate judge, that's gonna tell you whether you are gonna make bail or not.  But to me I think you will be a flight risk with the time that you are looking at, or a danger to the community.  You only got to go with one of those, I'm going to say your both um anyway um you understand your rights. I need you to sign right there saying that I read you your rights and that you understand them and print your name underneath of it.  You are a lefty? (VT-5).

The above statements of Agent Hughes shows how he used fear, pressure and psychological

ploys to induce Mr. Davis to speak with him.  Agent Hughes opened the door of "cooperation" for

Mr. Davis, saying that he could speak to the prosecutor on his behalf.  Agent Hughes created urgency

by warning Mr. Davis that "the window of opportunity" for cooperation was very small, meaning that

he would need to talk to him right away.  Agent Hughes had such control over the environment and

Mr. Davis that he even boldly *ordered* Mr. Davis to look at him to make eye contact.  Prior to any

<u>Miranda</u> waiver, Agent Hughes said to Mr. Davis in a commanding tone, "Eric, look at me while I

am talking to you." (VT-5).  Agent Hughes ordered Mr. Davis to look him in the eyes, knowing that

18

such a method can intimidate a suspect and produce the desired result: a waiver of <u>Miranda</u> and a statement from the accused. This type of inexcusable conduct was unconstitutional interrogation that undermined the free will of Mr. Davis. Agent Hughes actions contributed to the overall coercive atmosphere that violated the Fifth Amendment of the Constitution.

Mr. Davis' lack of sleep on a small desk in a brightly lit room, confined quarters, his 11th grade education, and the numerous statements of Agent Hughes that were designed to cause fear, all combined to undermine the subsequently given and reportedly waived <u>Miranda</u> warnings. Mr. Davis' waiver was involuntarily obtained under a totality of the circumstances analysis. Agent Hughes statements clearly pushed the totality of the circumstances in this case over the Constitutional ledge. Agent Hughes painted Mr. Davis a negative picture of despair, hopelessness, a very lengthy jail sentence, no hope of being released on bail, and no hope to be with his wife and child. Agent Hughes shrewdly knew what he was doing, as was evidenced by his statements in the videotape that was played for this Court. Consequently, this Court must find that Mr. Davis' waiver of <u>Miranda</u> was involuntary and suppress all evidence obtained as a result of his interrogation as a violation of the fruit of the poisonous tree doctrine. <u>Wong Sun</u>, 371 U.S. 471.

Furthermore, Agent Hughes' conduct shows that he was acting in a way that undermined the protections of <u>Miranda</u> by delaying the advisement of the <u>Miranda</u> warnings until after he made numerous statements about the dire circumstances that Mr. Davis was in, and already had Mr. Davis talking. Agent Hughes compounded his violation of <u>Miranda</u> by, after finally advising Mr. Davis of his rights, further delaying asking Mr. Davis if he wished to waive his <u>Miranda</u> rights until after making additional statements concerning how he would not receive bail, and how if he cooperated the prosecutor would be informed of his assistance (VT-5). These types of actions by Agent Hughes

19

are essentially the same as the question first and <u>Miranda</u> second tactics that the Supreme Court recently found to violate the Constitution in <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004).  In <u>Seibert</u>, the Supreme Court held that question-first type of interrogations make <u>Miranda</u> warnings "ineffective by waiting for a particularly opportune time to give them."  <u>Id</u>. at 612.  Although Mr. Davis did not confess to a crime prior to waiving his <u>Miranda</u> rights as occurred in <u>Seibert</u>, the tactics of Agent Hughes of making statements that are the functional equivalent of interrogation while waiting for the "opportune time" to finally advise and then later request a waiver, shows the extremely coercive environment that Mr. Davis was placed in, and rendered the subsequently obtained waiver involuntary.  Thus, <u>Seibert</u> lends additional support for the conclusion that Mr. Davis' <u>Miranda</u> waiver was involuntary and that the fruits of the interrogation must be suppressed.


                                        /s/ Christopher S. Koyste
                                        Christopher S. Koyste, Esquire
                                        Assistant Federal Public Defender
                                        704 King Street, Suite 110
                                        Wilmington, Delaware  19801
                                        Attorney for Defendant Eric Davis

DATED: November 29, 2005

**CERTIFICATE OF SERVICE**

Undersigned counsel certifies that a copy of Defendant's Motion to Suppress Evidence is available for public viewing and downloading and was electronically delivered on November 29, 2005 to:

Ferris Wharton, Esquire
Assistant United States Attorney
1007 Orange Street, Suite 700
Wilmington, DE 19801

/s/ Christopher S. Koyste
Christopher S. Koyste, Esquire
Assistant Federal Public Defender
704 King Street, Suite 110
Wilmington, Delaware  19801
Email: ecf_ck@msn.com
Attorney for Defendant Eric Davis