## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Criminal Action No. 05-54-KAJ** |
| | : | |
| **ERIC DAVIS,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S ANSWERING MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS  EVIDENCE

The United States of America, by and through its attorneys Colm F. Connolly, United

States Attorney for the District of Delaware, and Ferris W. Wharton, Assistant United States

Attorney for the District of Delaware, hereby answers the defendant's motion to suppress

evidence.  Although the defendant consented to a search of his vehicle, he has moved to suppress

the evidence discovered as a result of that search. Further, despite signing a written waiver of his

*Miranda* rights, the defendant similarly has moved to suppress the statement given to

investigators subsequent to that waiver. For the reasons set forth below, the motion should be

denied.

### A. <u>Facts</u>

Shortly before 1:00 a.m. on April 20, 2005, Ptlm. Kenneth Sheeky of the Delaware River

and Bay Authority Police Department stopped a silver GMC Denali because the vehicle's left

front headlight was not operating. (T-3-5).[1] The vehicle was occupied by the defendant, who was

---

[1]References designated as "T" are to the transcript of the October 4, 2005 suppression hearing. References designated as "VT" are to the partial transcript of the defendant's videotaped statement.

driving and a passenger, Marlon Pettaway. (T-8, 16-17). Ptlm. Sheeky approached the driver,

advised him why he was being stopped, and requested his license, registration and insurance

card. (T-5). The defendant produced a valid Virginia driver's license and registration card, but

was unable to produce any proof of insurance for the vehicle. (T-6). During that encounter, Ptlm.

Sheeky asked the defendant some routine questions such as: Where are you going? Where are

you coming from? What is the purpose of your trip? and Who do you have in the car with you?

*Id.* At that point Ptlm. Sheeky noticed that every time he asked a question, the defendant

repeated the question before he answered, which Ptlm. Sheeky took as a sign of nervousness as if

he were trying to buy time to think of an answer acceptable to the officer. (T-7, 27).

Ptlm. Sheeky returned to his vehicle to check to see if either of the vehicle's

occupants was wanted and to make sure that the driver's license was valid. (T-8). While in his

patrol vehicle, Ptlm. Sheeky noticed that the defendant was paying very close attention to him.

*Id.* In fact, Pltm. Sheeky testified that the defendant observed him more intently than he had ever

been observed in his six years as a police officer. (T-40).

At that time, the officer determined to write the defendant a written warning instead

of issuing him a ticket for the violation. (T-8,9). Ptlm. Sheeky approached the defendant's

vehicle to issue the warning and asked the defendant to exit his vehicle. He gave the defendant

the written warning which the defendant signed. (T-10). He then gave the defendant his copy of

the warning as well as his license and registration. *Id.*

Next, Ptlm Sheeky asked the defendant if he could ask him some questions. (T-10,

11, 56). The defendant agreed. (T-11, 12, 56). Specifically, he asked the defendant if he had

anything illegal in the car, and whether he had a problem with the officer looking in the car. (T-

10). The defendant said that he did not have anything illegal in the car and that he did not have a problem with Ptlm. Sheeky looking in the car. *Id.* Ptlm. Sheeky explained that he sought permission to search the vehicle because of all of the circumstances - the two individuals were not sure specifically where they were coming from; they were coming back from a two-day trip "with not even a toothbrush"; the intensity with which the defendant monitored Ptlm. Sheeky's movements; and the defendant's repetition of Ptlm. Sheeky's questions before answering them. (T-10,11). Ptlm. Sheeky had already filled out a consent to search form which he asked the defendant to read, and if he agreed to allow the search, to sign it. (T-12). The defendant signed the form at 1:05 a.m. after appearing to have read it. (T-13).

Before requesting permission to search the defendant's vehicle, Ptlm. Sheeky contacted a second officer to respond to the location of the vehicle stop to give him some assistance and to back him up for officer safety. (T-14). After Master Corporal David Winch responded, Ptlm. Sheeky obtained the defendant's signature on the consent form, patted down the defendant and approached the vehicle. *Id.* He asked the passenger to exit and patted him down for safety as well. *Id.* Ptlm. Sheeky then proceeded to search the vehicle while Master Corporal Winch watched the defendant and Pettaway who were sitting on the guardrail. (T-14, 15). At the end of his search, Ptlm. Sheeky located two bags containing large chunks of heroin under the front passenger seat. (T-15). At that point both of the individuals were placed under arrest. *Id.*

After both of the vehicle's occupants were arrested, they were brought to the front of Ptlm. Sheeky's patrol vehicle where they were both put on their knees next to each other. *Id.* Ptlm. Sheeky then read both men their *Miranda* rights off of his *Miranda* warning card - Davis first and then Pettaway. (T-17, 18). When asked if he understood his rights, Davis said that he

-3-

did. (T-18). When asked if he was willing to speak to the officers, he said that he was not sure,

but he did not invoke his right to remain silent. *Id.* After reading Pettaway his rights, both men

were transported to the police troop at the Delaware Memorial Bridge. (T-18, 19). There, they

were placed in two separate holding areas. (T-19).

At the direction of his colonel, Ptlm. Sheeky contacted Special Agent David Hughes of

the Drug Enforcement Administration ("DEA"). (T-20). Pltm Sheeky advised S/A Hughes about

the nature of the traffic stop and of the amount of narcotics he had discovered. *Id.* He also told

S/A Hughes that he had advised the defendant of his *Miranda* rights, but since the defendant was

unsure whether he wanted to give a statement or not, he did not question him.[2] (T-20). S/A

Hughes agreed to come to the troop later that morning at about 8:00 or 8:30 a.m. (T-21).

S/A Hughes arrived later that morning as planned. *Id.* When he arrived, he spoke with

Ptlm. Sheeky again, looked over some paperwork and met the defendant around 9:00 a..m. for

the purpose of interviewing him. (T-61). That interview was witnesses by Ptlm Sheeky who also

witnessed the defendant's signature on *Miranda* rights form that S/A Hughes gave to the

defendant. (T-22). After introducing himself to the defendant, S/A Hughes advised the defendant

that he would probably be "processed" federally. (VT-1). He then asked the defendant a series of

questions in order to obtain "pedigree" information . (VT-1-4). S/A Hughes also explained to the

defendant the nature of the federal charges he was facing and the possible penalties, including

possible enhanced penalties as a result of his prior criminal record. (VT-4). S/A Hughes advised

---

[2]S/A Hughes' recollection was slightly different. He  recalled that Ptlm. Sheeky told him
that he had advised the defendant of his *Miranda* rights, that he had not invoked his right to
remain silent and that Ptlm. Sheeky had not attempted to interview him, but he did not recall
Pltm. Sheeky telling him that the defendant was unsure about whether he wished to make a
statement. (T-60, 75).

the defendant of his *Miranda* rights by reading them off of a form while the defendant followed along. (VT-5). S/A Hughes then told the defendant that he had an opportunity to cooperate with the government, but that opportunity was limited, because it was likely that he would be detained prior to trial. *Id.* The defendant then signed the form and gave a statement to S/A Hughes. (VT-5, 6; T-63).

      **B. Argument.**

**1. The Defendant Was Not "Seized" When He Consented To A Search Of His Vehicle.**

The defendant claims that he was unlawfully seized in violation of the Fourth Amendment when Ptlm. Sheeky engaged him in routine questioning about where he was going and where he had been so as to invalidate his subsequent consent to search his vehicle. (Op. Mem. at 5, 6). He also claims that the allegedly unlawful seizure continued after Pltm. Sheeky issued him a warning and returned his license and registration to him, despite the fact that he agreed to continue to speak to Ptlm. Sheeky. (Op. Mem. at 8). Both of these claims are without merit.

While the Fourth Amendment prohibits unreasonable searches and seizures and that searches conducted without a warrant based on probable cause are *per se* unreasonable, it is well settled that a search conducted pursuant to consent constitutes an exception to the warrant requirement. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973). The "touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno,* 500 U.S. 248, 250 (1991). Reasonableness is measured objectively by examining the totality of the circumstances and not by reliance upon bright-line rules. *Ohio v. Robinette,* 519 U.S. 33, 39 (1996). For example, knowledge of the right to refuse consent is only one factor to be taken into account. *Schneckloth,*

*supra* at 227. Similarly, once a motor vehicle has been lawfully detained for a traffic violation, a police officer may order the driver to exit the vehicle without violating the Fourth Amendment's proscription against unreasonable searches and seizures, regardless of the officers subjective thoughts. *Robinette, supra* at 38; *Pennsylvania v. Mimms,* 434 U.S. 106, 111, n. 6. (1977). Further, a defendant need not be advised that he is free to leave before his consent will be deemed voluntary. *Robinette, supra,* at 35.

The question here, therefore, is whether, having probable cause to stop the defendant, it was unreasonable for Ptlm. Sheeky to ask him about the origin and destination of his travel and the purpose and duration of his stay in New York, and further, when those answers were not particularly illuminating, to ask for more specificity. The warning issued to the defendant indicates that the traffic offense occurred at 12:54 a.m. (GX-1).[3]  The defendant signed the consent to search at 1:05 a.m. (GX-2). In those eleven minutes, Pltm. Sheeky conducted his initial conversation with the defendant, obtained his driver's license and registration, ran both the defendant and his passenger in the computer, called for a back-up police officer, filled out both the warning and consent to search forms and explained the consent to search form to the defendant. (T-5, 7-12, 14). During that time, the defendant was not handcuffed. (T-15).

Yet, the defendant claims that Ptlm. Sheeky's brief questioning of the defendant was unreasonable under the Fourth Amendment because the officer asked more question that were necessary to issue the traffic warning, since those questions had the potential for detecting criminal activity. (Op. Mem. at 7). "Questions that hold the potential for detecting crime, yet

---

[3]References to "GX" refer to Government exhibits introduced at the suppression hearing. References to "DX" refer to defense exhibits at that hearing.

create little or no inconvenience, do not turn reasonable detention into unreasonable detention."

*United States v. Burton,* 334 F.3d 514, 518 (6th Cir. 2003) (quoting *United States v. Childs,* 277

F.3d 947, 954 (7th Cir. 2002). The questioning here, conducted during the course of a proper

traffic stop was brief, not oppressive, created little or no inconvenience and was clearly not

unreasonable.

The defendant next claims that the defendant continued to be seized after Ptlm. Sheeky

returned his driver's license and the written warning was signed. (Op. Mem. at 8). He claims,

without any support in the record, that the defendant's agreement to answer additional questions

was only a "submission to the authority of the police officer" and was not knowing because he

was not informed he was free to leave. *Id.* As to the suggestion that the defendant merely

submitted to the authority of the police officer, the record belies that contention. (T-10, 11, 12,

56). His contention that his agreement to speak to Ptlm. Sheeky was not knowing because he was

not told he was free to leave was expressly rejected by the Supreme Court in *Robinette, supra* at

35.

Given that Ptlm. Sheeky's limited questioning of the defendant during a proper traffic

stop was reasonable, that the defendant freely agreed to answer additional questions and that he

gave his verbal and written permission to search his vehicle, the resulting search was did not

violate the defendant's Fourth Amendment rights. Accordingly, the motion to suppress evidence

as it relates to the search of the defendant's vehicle should be denied.

## 2. The Defendant Never Invoked His *Miranda* Right To Remain Silent.

The defendant acknowledges that he was advised of his *Miranda* rights by Ptlm. Sheeky

and that he responded by saying that he understood those rights but was not sure that he wished

to make any statements. (Op. Mem. at 10, 11). Notwithstanding that acknowledgment, the defendant claims that the fact that Ptlm. Sheeky did not pursue any questioning of the defendant somehow converted his equivocal response into an objectively clear invocation of his right to remain silent. The facts do no permit such alchemy, however. The record is clear that the defendant said that he was unsure if he wanted to make any statements, and the record is equally clear that Ptlm. Sheeky did not consider that statement an invocation. (T-18). Because the defendant did not unambiguously invoke his right to remain silent, S/A Hughes was not precluded from seeking to take a statement from him. *See Davis v. United States,* 512 U.S. 452, 459 (1994).

**3. The Defendant Voluntarily Waived His *Miranda* Rights When He Spoke To S/A Hughes.**

The defendant claims that his waiver of his *Miranda* rights, given to S/A Hughes was involuntary under the totality of the circumstances due to the actions of S/A Hughes. (Op. Mem. at 12). He asserts that S/A Hughes used psychological ploys to create an atmosphere of nervousness, fear and apprehension on the part of the defendant prior to seeking a waiver of his rights from him. (Op. Mem. at 14-18). Specifically he claims that S/A Hughes improperly controlled the environment of the interview and engaged the defendant in a conversation about "pedigree" information prior to advising him of his rights, including an explanation of the charges, possible penalties, and the opportunity to cooperate. *Id.* The Court has before it a videotape of the interview of the defendant conducted by S/A Hughes. (GX-4). It also has a transcript of a portion of that interview relating to the defendant's waiver of his rights, as well as a written waiver of rights form signed by the defendant. (DX-1, GX-3).

A defendant may waive his *Miranda* rights if the waiver is made knowingly, intelligently

and voluntarily. *Miranda v. Arizona,* 384 U.S. 436, 444 (1966). The validity of a suspect's waiver of his *Miranda* rights is assessed in light of the "totality of the circumstances surrounding the interrogation." *Fare v. Michael C.,* 442 U.S. 707, 724-25 (1979). Among the relevant circumstances present here are the defendant's age - 33 (GX-1); his education - attended 12th grade (VT-50); and apparent experience with the criminal justice system (VT-4). The government has the burden of proving the validity of the waiver by a preponderance of the evidence. *See Colorado v. Connolly,* 479 U.S. 157, 168-69 (1986).

It is more than a bit ironic that the defendant is claiming that he was coerced into waiving his *Miranda* rights as a result of being provided with more information than is ordinarily provided. Often the complaint is that a defendant was provided with insufficient information in order to make an informed, intelligent choice as to whether to speak to investigators or not. *See Moran v. Burbine,* 475 U.S. 412, 422 (1986) ("...the police were not required to advise the suspect of all information that might be relevant to a decision to waive his rights."); *Colorado v. Spring,* 479 U.S. 564, 574 (1987) ("The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege."); *United States v. Durham,* 741 F. Supp. 498, 502 (D. Del. 1990) (ATF agents not required to advise defendant of possible enhanced punishment as an habitual offender.). Further, authorities may tell a defendant that cooperation will lead to a more favorable outcome in a criminal case. *See e.g. United states v. Ruggles,* 70 F.3d 262, 265 (2d Cir. 1995); *United States v. Nash,* 910 F.2d 749, 752-53 (11th Cir. 1990).

A careful look at the videotape and review of the slightly more than five pages of pertinent transcript reveals that S/A Hughes did nothing improper to overbear the defendant's

will. The first three pages are essentially "pedigree" information.[4] (DX-1). Next, S/A Hughes

explained to the defendant possible penalties including possible enhancements as a result of one

or more prior convictions. (VT-4). After briefly telling the defendant that he should think about

his family, he advised the defendant of his *Miranda* rights. (VT-4, 5). Finally, before obtaining a

waiver, S/A Hughes told the defendant that because he would likely be detained, he had a small

window of opportunity within which to consider cooperating with the government. (VT-5). The

time between when S/A Hughes entered the room and when the defendant signed the waiver of

rights form was about 12 minutes. (DX-1). The amount of time that elapsed after the "pedigree"

conversation ended and when the defendant executed the form was approximately 5 ½ minutes.

As the videotape shows, S/A Hughes demeanor was professional throughout. (DX-1). Given all

of the circumstances, it is evident that the defendant's will was not overborne and that he

knowingly, intelligently and voluntarily waived his *Miranda* rights. Accordingly, the defendant's

motion to suppress his statement should be denied.

---

[4]The defendant's complaint that S/A Hughes obtained more "pedigree" information than was necessary (such as the defendant's cellular telephone number) would seem to go more to the admissibility of that information than to the voluntariness of the waiver.

**4. Conclusion.**

For the reasons set forth above the United states respectfully requests that the Defendant's motion to suppress evidence be denied.

Respectfully submitted

COLM F. CONNOLLY
United States Attorney


By:   /s/ Ferris W. Wharton
      Ferris W. Wharton ID# 945
      Assistant United States Attorney
      Nemours Building
      1007 Orange Street, Suite 700
      Wilmington, Delaware 19899
      302-577-6277


Dated: December 13, 2005

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 05-54-KAJ |
| | : | |
| ERIC DAVIS, | : | |
| | : | |
| Defendant. | : | |

## CERTIFICATE OF SERVICE

I, Jennifer Brown, an employee in the Office of the United States Attorney, hereby certify under penalty of perjury that on December 13, 2005, I electronically filed:

## GOVERNMENT'S ANSWERING MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

with the Clerk of Court using CM/ECF. Said document is available for viewing and downloading from CM/ECF, which will send notification of such filing(s) to the following:

Christopher Koyste, Esquire
Federal Public Defender's Office
First Federal Plaza
704 King Street, Suite 110
Wilmington, DE 19801


     /s/ Jennifer Brown
     Jennifer Brown