FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE 2006 JAN 30  PM 5: 02

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 05-54-KAJ |
| | ) | |
| ERIC DAVIS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

**I. Introduction**

This criminal case is before me on the defendant's motion "to suppress any and all evidence obtained on or about April 20, 2005, during and after the stop of the automobile which Mr. Davis was driving ... ." (Docket Item ["D.I."] 11; the "Motion".) For the reasons set forth, the Motion is denied.

**II. Background**

In the early morning of April 20, 2005, shortly before 1:00 a.m., Patrolman Kenneth Sheeky of the Delaware River and Bay Authority Police Department saw a silver GMC sport utility vehicle ("SUV") headed southbound on I-295 near the Delaware Memorial bridge toll plaza. (Tr. at 4-5.)[1]  He noted that the front left headlight on the SUV was not working, so he activated his emergency lights and directed the driver to pull to the side of the road. (*Id.* at 5, 25.) The driver complied. (*See id.* at 5.) Patrolman Sheeky approached the SUV and told the driver, who was the defendant,

---

[1]Citation to "Tr. at [page number]" are to the transcript of the October 4, 2005 suppression hearing in this case.

Eric Davis, why he was stopped. (*Id.* at 5-6, 8.) Patrolman Sheeky then asked for the defendant's license, vehicle registration, and proof of insurance on the vehicle. (*Id.* at 5-6.) The defendant supplied his licence and the registration card but was unable to provide proof of insurance. (*Id.* at 6.)

As Patrolman Sheeky was obtaining documents from the defendant, he "asked some routine questions: Where are you going? Where are you coming from?  What is the purpose of your trip? and ... 'who do you have in the car with you' ... ." (*Id.*)  He noticed that, every time he asked a question, the defendant repeated it before answering and then gave broad, non-specific responses, all of which struck the Patrolman as a stalling tactic indicating that the defendant was nervous and hesitant to answer questions. (*See id.* at 7, 27.)  The defendant eventually revealed that he was returning after a couple of days in New York City with his passenger, Martin Pettaway. (*Id.* at 6, 40.)  Patrolman Sheeky looked through the SUV's driver's side windows "the best that [he] could" and did not see any luggage. (*Id.* at 30; *see id.* at 36.)  He then returned to his police car to run a computer check on the defendant's name and license number. (*Id.* at 8.)

As he sat in the police car, Patrolman Sheeky observed that the defendant was paying "very close attention" to him, watching him intently in the SUV's rearview and sideview mirrors. (*See id.* at 8, 40.)  While he had "had people watch [him] before" during traffic stops, in his six years of experience with the police, "this was the most intently [he] was observed." (*Id.* at 40.)  He decided that he would write a warning rather than a traffic ticket for the non-operational headlight but that he would also ask

the defendant for consent to search the SUV. (*Id.* at 8-11, 40.)  Having decided that he

wanted to search the vehicle, Patrolman Sheeky called for the assistance of another

officer, who arrived as Patolman Sheeky was writing the warning. (*Id.* at 14, 39.)

Patrolman Sheeky again approached the defendant and this time asked him to get out

of the SUV. (*Id.* at 10.)  The defendant did so, and the patrolman explained the written

warning and had the defendant sign it. (*Id.*; Gov't Ex. 1)  He then told the defendant

that he'd like to ask him some questions.  He said something to the effect of "Could I

ask a few questions?" (*id.* at 10), or, "Do you have a minute.  Let me ask you some

questions." (*Id.* at 11.)  The defendant said, "Sure." (*Id.*; *see also id.* at 56.)  Patrolman

Sheeky then asked, "Do you have anything illegal in the vehicle?" to which the

defendant responded, "no, I don't." (*Id.* at 12.) "Do you have a problem if I take a look

in the vehicle?" Patrolman Sheeky asked, and again the defendant said, "no, I don't."

(*Id.*)[2]  The patrolman handed the defendant a "consent to search" form and asked him

to read it and sign it if he agreed, which the defendant did. ((*Id.* at 13; Gov't Ex. 2.)

According to the time noted on the written warning, which was 12:54 a.m. (Gov't Ex. 1,

noting military time of "0054"), and the time noted on the consent to search form, which

was 1:05 a.m. (Gov't Ex. 2, noting military time of "0105"), the elapsed time from the

stop to the time the search began was something on the order of ten to fifteen minutes.

For his own safety and that of the assisting officer, Patrolman Sheeky patted

down the defendant and the passenger. (*Id.* at 14.)  The assisting police officer then

---

[2]It is not clear whether any additional questions were asked at this point, but, if
there were, they were most likely directed to the same topics as were the patrolman's
first questions. (*See id.* at 44-45.)

watched the defendant and passenger while Patrolman Sheeky searched the SUV. (*Id.*) Underneath the front passenger seat, Patrolman Sheeky found two bags containing heroin. (*Id.* at 16.) He and the assisting officer then placed the defendant and the passenger under arrest. (*Id.*)

After seeing that the two were handcuffed, Patrolman Sheeky read them their *Miranda* rights from a pre-printed card. (*Id.* at 16-18.) In response to the question, "with these rights in mind will you talk to us at this time[,]" the defendant "just basically said, 'Well I'm not sure if I should, I'm really not.'" (*Id.* at 18.) So, "to err on the side of caution," Patrolman Sheeky decided not to ask any further questions of the defendant at that point, but later did ask him basic identifying information while filling out paperwork associated with the arrest. (*Id.* at 49, 51.) Patrolman Sheeky and the assisting officer took the defendant and the passenger to the nearby police troop and placed them in separate holding areas. (*Id.* at 19.) After handling paperwork, processing evidence, and dealing with other administrative matters, Patrolman Sheeky made a telephone call to Special Agent David Hughes of the United States Drug Enforcement Agency. (*See id.* at 19-20.) By this time, it was approximately 2:30 to 3:00 a.m. (*Id.*)

According to Patrolman Sheeky, he told Agent Hughes that he had read the defendant the standard *Miranda* warnings but that the defendant "wasn't sure what he wanted to do, if he wanted to give a statement so I didn't question him anymore about anything related to the traffic stop." (*Id.* at 20.) Agent Hughes remembered the conversation somewhat differently. He testified that, "the statements that Patrolman

Sheeky made to me ... were based upon my questions.  My questions were, 'did you

Mirandize them?' 'Yes." I said, 'Did they invoke Mianda?' 'No.'  And then the next

question was, 'Had they been interviewed?'  He said, 'No.'" (*Id.* at 75.)  Agent Hughes

arranged to come to the troop later that morning, which he did.  (*Id.* at 21, 75.)

Shortly before 9:00 a.m., Agent Hughes entered the room where the defendant

was being held.  (*Id.* at 61.)  The conversation that followed between the agent and the

defendant was videotaped (Gov't Ex. 4) and witnessed by Patrolman Sheeky (Tr. at 21-

22), and it is also memorialized in a transcript that was prepared by defense counsel

(Def. Ex. 1).  It began with Agent Hughes introducing himself and telling the defendant,

in essence, that he would be charged with a federal crime and that there were some

routine booking questions to go through.  (*See* Def. Ex. 1 at 1.)  Agent Hughes then

asked the defendant whether he owned a car, where he was born, what his current

address was, whether he had tattoos and, if so, what and where they were, whether he

was employed, what his home phone and cell phone numbers were, whether he had a

passport, whether he had a driver's license, what the names and ages of his parents

were, the name, age, and contact information for his wife, the names of any children he

might have and where they lived.  (*Id.* at 1-4.)  According to the time notations on the

transcript, it took approximately six minutes to go through those questions and answers.

(*Id.*)

At that point, the defendant asked Agent Hughes a question, referring to papers

the agent had: "What's all of that?" (*Id.* at 4.)  The agent responded, "It's your criminal

record, Mr. Davis, and it doesn't look very positive.  Especially in reference to drug

activity." (*Id.*) He then spent about twenty seconds explaining what he believed to be

the consequences of the Federal Sentencing Guidelines, in light of the more than 100

grams of heroin found in the SUV and the defendant's criminal history: "That's a

minimum of 5 years so that's 5 to 40 years in the Federal system.  So you start out at 5

years and every conviction you have it kinda goes up from there, alright.  You've got

some felony convictions here which ... may or may not make you a career offender ... ."

(*Id.*)  Agent Hughes next told the defendant, "[o]ne thing you should know and definitely

want to think about is ... your family, your daughter, your wife." (*Id.*)  He then

immediately produced a pre-printed DEA form setting forth the standard *Miranda*

warnings (Gov't Ex. 3), and read it aloud to the defendant.  (Def. Ex. 1 at 4-5.)  Having

read the form to the defendant, Agent Hughes said the following:

> Now with all that being said.  One thing I want to say to you is I've made contact
> with the United States Attorneys Office, the prosecutor o.k.  Ah, based upon
> what you tell me here today.  Um is going to way [sic] um upon the way what we
> do on how we proceed from here.  What I mean by that is um again no promises
> can be made and no threats can be made to you, but the bottom line is this, If
> you are cooperative individual your cooperation will be relayed to the United
> States Attorney's Office specifically the prosecutor.  Eric look at me while I am
> talking to you.  This is a very small window of opportunity which you have to try
> and help yourself out ok.  But its awful small because once you go through the
> formal process, the Federal process o.k. you are going to be incarcerated.  I
> would say probably 95% plus don't get bail in the Federal System, alright and
> that's just because of the nature of the crime and looking at your prior criminal
> history, and what you had in the vehicle, I'm going to, I'm going to bet that you
> won't get bail.  Ok.  I'm not not [sic] saying that you won't because I'm not the
> judge.  Alright, I'm not the magistrate judge, that's gonna tell you whether you
> are gonna make bail or not.
> But to me I think you will be a flight risk with the time that you are looking at, or a
> danger to the community.  You only got to go with one of those, I'm going to say
> your both um anyway um you understand your rights.  I need you to sign right
> there saying that I read you your rights and that you understand them and print
> your name underneath of it.

(*Id.* at 5.)

The defendant then signed the *Miranda* waiver form (*id.* at 6) and, while they were not specified during the suppression hearing, made a series of statements which the defendant is now concerned are incriminating.  (*See* D.I. 19 at 5.)

## III.  Legal Standard

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. However, once the defendant has established a basis for his motion, ... the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir.1995).  This principle holds true beyond the Fourth Amendment context.  *See United State v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) ("[I]f a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination."); *see also United States v. Sacco*, 563 F.2d 552, 558 (2d Cir.), *cert. denied*, 434 U.S. 1039 (1977) (In a wiretap case, "although the government has the ultimate burden of persuasion to show that its evidence is untainted, [the defendant] ha[s] the initial burden of producing specific evidence demonstrating taint in a substantial portion of the Government's case against him." (citations and internal quotation marks omitted)).

The Government's bears its burden by establishing by a preponderance of the evidence that the actions of its agents are consonant with constitutional protections. *See United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974) ("the controlling burden of

proof at suppression hearings should impose no greater burden [on the Government]

than proof by a preponderance of the evidence"); *see also United States v. Jacobs*, 431

F.3d 99, 109 (3d Cir. 2005) ("The burden is on the Government to establish, by a

preponderance of the evidence, that a challenged statement was voluntary.")

## IV.  Discussion

The defendant contends that evidence against him must be suppressed for three

reasons.  First, he argues that he was illegally seized by Patrolman Sheeky, because

the patrolman asked questions that "diverged from the traffic stop to unrelated

matters[.]" (D.I. 19 at 7.)  Consequently, as defendant sees it, any evidence obtained

after Patrolman Sheeky asked questions about anything other than the broken

headlight "must be suppressed as a violation of the fruit of the poisonous tree doctrine."

(*Id.* at 8; citing *Wong Sun v. United States*, 371 U.S. 471 (1963).)  Second, the

defendant argues that he had invoked his Fifth Amendment right to remain silent when

Patrolman Sheeky advised him of his rights following the discovery of the heroin in his

SUV, and, therefore, that any statements taken from him after that point were in

violation of his Fifth Amendment rights and the protections established by the Supreme

Court's ruling in *Miranda v. Arizona*, 384 U.S. 436 (1966).  (D.I. 19 at 9-11.)  Finally, the

defendant maintains that his Fifth Amendment rights were violated by the custodial

interrogation conducted by Agent Hughes, since Agent Hughes created a "coercive

environment" that made the defendant's waiver of *Miranda* rights involuntary.  (*Id.* at 12-

20.)  The Government, of course, takes the opposite side of each of these contentions.

While I do not share the Government's unalloyed satisfaction with the events

surrounding the defendant's interrogation, I have concluded that the Government has borne its burden of showing that the challenged evidence was gathered in a manner consistent with the defendant's constitutional rights.

A. *The Traffic Stop and Vehicle Search*

The defendant does not contend that there was anything improper about Patrolman Sheeky's decision to pull him over for a traffic violation. His argument is, rather, that the patrolman used the traffic stop as "carte blanche" to engage in an unwarranted detention and investigation of the defendant. (*Id.* at 7-8.) The facts, however, simply do not bear that interpretation. Less than fifteen minutes elapsed from the time Patrolman Sheeky pulled the defendant over until the time the patrolman obtained the defendant's consent to search the SUV. *Supra* at 3 (citing times noted on Gov't Ex. 1 and Gov't Ex. 2.) During that time, the patrolman approached the defendant's SUV, conducted his initial conversation with the defendant, obtained the defendant's license and registration, returned to his own vehicle, ran a computer check on the defendant's documents, called for back-up, filled out a written warning, filled out a consent to search form, and returned and explained the warning and the consent form to the defendant. *See supra* at 1-3. That was a reasonable amount of time to accomplish legitimate law enforcement purposes, all of which were connected to a valid traffic stop. The questions the patrolman asked where brief "what is the nature of your trip" inquiries. The defendant has cited no case, and I have found none, in which comparable facts were held to constitute an unreasonable seizure. *Cf. United States v. Burton*, 334 F.3d 514, 518 (6th Cir. 2003) ("Questions that hold potential for detecting

9

crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention." (quoting *United States v. Childs,* 277 F.3d 947, 954 (7th Cir.) (en banc), *cert. denied,* 537 U.S. 829 (2002)).

Since the defendant said nothing obviously incriminating during the traffic stop,[3] his aim in asserting that he was illegally seized evidently is not to suppress any statements he made at that point but, rather, to undermine the effect of the consent he gave to search his SUV. (*See* D.I. 19 at 8.) He emphasizes that he was asked to step out of his car, that another police officer had arrived by that point, and that he was asked the same questions he had been asked the first time Patrolman Sheeky questioned him. (D.I. 23 at 1.) He argues that in agreeing to answer additional questions after he was given the written warning, he was merely submitting to the authority of the police and that his agreement to stay put for such questioning "was not 'knowing' because ... [he] was not informed that he was free to leave." (*Id.*)

Again, the facts and the law do not support the defendant's conclusion. It is well established that a search pursuant to consent is a "specifically established exception[] to the requirements of both a warrant and probable cause[,]" *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973), and nothing in this record warrants a conclusion that the defendant's consent was less than knowing and voluntary. The defendant is an adult who was thirty-three years old at the time of his conversation with Patrolman Sheeky. (*See* Gov't Ex. 1 (showing defendant's date of birth as 3/30/72).) There was, it seems, no language barrier or mental infirmity to impair the defendant's ability to

---

[3]That is not to say, of course, that his manner of saying it may not have been incriminating.

10

understand what he was being asked or the consequences of his consent.  (*See* Tr. at 13 (noting that the defendant appeared to read the consent form before signing it); Tr. at 18 (noting that the defendant stated he understood the *Miranda* warnings that were read to him); Def. Ex. 1 at 5 (defendant stating that he attended school to the 12th grade).)  There was nothing inappropriate in Patrolman Sheeky's asking the defendant to step out of the SUV.  *See Pennsylvania v. Mimms,* 434 U.S. 106, 111, n. 6 (1977) ("We hold ... that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures").  There is no evidence that the questions the patrolman posed were inappropriate in themselves or that they were posed in an inappropriate manner, nor can the appearance of another police officer on the scene be fairly characterized as an overwhelming show of force. *Cf. Ohio v. Robinette* 519 U.S. 33, 39 (1996) ("Reasonableness ... is measured in objective terms by examining the totality of the circumstances.").  And the failure to tell the defendant that he was free to leave is inconsequential, since the defendant gave written consent which included the statement, "I have been advised ... that I have the right to refuse giving my consent to search." (Gov't Ex. 2.)  *See Robinette,* 519 U.S. at 40 (it would be "unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary").

In short, the traffic stop and ensuing search were lawful and the evidence obtained during the stop and search will not be suppressed.

B. *The Interrogation of the Defendant*

After the heroin was discovered in the SUV and the defendant was placed under

arrest, Patrolman Sheeky read him his *Miranda* rights and asked whether the defendant

would speak further with the police.  (Tr. at 16-18.)  The defendant responded by

saying, 'Well I'm not sure if I should, I'm really not.'" (*Id.* at 18.)  The defendant argues

that, by that statement, he invoked his right to remain silent and, therefore, anything he

said as a consequence of further questioning by law enforcement agents must be

suppressed.  (D.I. 19 at 10.)[4]

That statement, however, is, on its face, not an unequivocal invocation of the

right to remain silent and hence did not preclude a later attempt to question the

defendant.  In *Davis v. United States*, 512 U.S. 452 (1994), the Supreme Court

addressed the effect of a suspect's ambiguous statement regarding whether he wished

to invoke his right to counsel.  The Court said, "if a suspect makes a reference to an

attorney that is ambiguous or equivocal in that a reasonable officer in light of the

circumstances would have understood only that the suspect *might* be invoking the right

to counsel, our precedents do not require the cessation of questioning." *Id.* at 459

(original emphasis).  The principle that, to be effective, an invocation of rights must be

---

[4]In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court established a
prophylactic procedure to safeguard Fifth Amendment rights, ruling that people in police
custody had to be advised of a now famous litany of rights before being questioned,
and that, in the absence of such an advice of rights, any statements elicited by
interrogation could not be used against the person interrogated. *See id.* at 492
("Miranda was not in any way apprised of his right to consult with an attorney and to
have one present during the interrogation, nor was his right not to be compelled to
incriminate himself effectively protected in any other manner. Without these warnings
the statements were inadmissible.")

12

clear and unequivocal is also applicable to the right to remain silent. *See James v. Marshall*, 322 F.3d 103, 108 (1st Cir. 2003) ("[E]very circuit that has directly addressed the issue "has concluded that *Davis* applies to both components of *Miranda*: the right to counsel and the right to remain silent."). Hence, the defendant's roadside equivocation on his right to remain silent did not prevent Agent Hughes from later interrogating him.[5]

The defendant's last line of attack is on the voluntariness of his statements. He argues that, under the totality of the circumstances, Agent Hughes's actions "created a coercive atmosphere that induced involuntary statements." (D.I. 19 at 12.) Among the facts leading the defendant to that conclusion are that, before Agent Hughes read him his *Miranda* warnings, the defendant had been in a holding room for approximately six hours (*id.* at 14), the "entire interrogation took place in an environment controlled by law enforcement (*id.*), Agent Hughes asked him questions that had an investigatory purpose and gathered information to use as a psychological ploy to induce a waiver (*id.*

---

[5]The defendant argues that Patrolman Sheeky understood the defendant's statement as an invocation of his right to remain silent. (D.I. 19 at 10.) That is not, however, what the patrolman said. While it is true that, out of an abundance of caution, he chose not to ask further questions at that point (Tr. at 49-51), Patrolman Sheeky explicitly stated his understanding that the defendant had not invoked his right to silence. According to the patrolman, in response to the question, "with these rights in mind, will you talk to us at this time," the defendant, "was unsure. I don't recall exactly what he said. He did not invoke his right to remain silent." (*Id.* at 18.) More to the point, however, the question is not what Patrolman Sheeky thought of the defendant's statement; the question is whether, viewed objectively, the defendant's statement was sufficiently clear that a reasonable police officer would understand that the defendant had invoked his right to remain silent. Under that standard, the statement, "Well I'm not sure if I should, I'm really not" does not constitute an invocation of the Fifth Amendment right to silence, even if Patrolman Sheeky chose to be particularly cautious about it. *Cf. Burket v. Angelone*, 208 F.3d 172, 200 (4th Cir. 2000) (ruling in *habeas* context that, following *Miranda* warnings, a suspect's statements of "'I just don't think that I should say anything' and 'I need somebody that I can talk to[]' ... do not constitute an unequivocal request to remain silent").

13

at 15), Agent Hughes made statements about potential criminal penalties and pretrial

detention that were designed to make the defendant "nervous and scared" (*id.* at 16,

18), Agent Hughes told the defendant to think about his wife and daughter (*id.* at 17),

Agent Hughes created "a sense of urgency" by warning the defendant that he had a

limited "window of opportunity" for cooperation (*id.* at 18), and Agent Hughes

intimidated the defendant by telling him, "look at me while I'm talking to you" (*id.* at 18-

19).

To all of this, the Government responds that the videotape of the conversation

between the defendant and Agent Hughes (Gov't Ex. 4) demonstrates that the

defendant's will was not overborne.  (D.I. 20 at 9-10.)  In light of the entire record,[6]

including the videotape, I agree that the Government has carried its burden of showing

that the defendant's written waiver of his right to remain silent (Gov't Ex. 3) was a

knowing, voluntary, and intelligent waiver of that right and that the statements that the

defendant made thereafter were made voluntarily and are admissible.

The Third Circuit has recently explained,

> A statement is given voluntarily if, when viewed in the totality of the
> circumstances, it is the product of an essentially free and unconstrained choice
> by its maker.  If an individual's will is overborne or that person's capacity for self-
> determination is critically impaired, her or his statements are involuntary.  A
> suspect's background and experience, including prior dealings with the criminal
> justice system, should be taken into account in the voluntariness inquiry.  A
> necessary predicate to a finding of involuntariness is coercive police activity.
> Further, there must be some causal connection between the police conduct and

---

[6]The defendant does not try to argue that any one of the factors he names would
be sufficient to make the defendant's written waiver less than effective.  Instead, he
argues that it is the combination of those factors that should lead to that conclusion.

the confession.

*Jacobs*, 431 F.3d at 108-09.

First, the defendant's being in custody for six hours did not render him incapable of making an intelligent choice about his rights.  Nothing in the record indicates that the defendant was deprived of sleep or that he was mistreated in any way.  He was simply held in a room for a few hours until Agent Hughes arrived before 9:00 a.m.  (Tr. at 19, 61.)  Next, the assertion that the interrogation took place under "an environment controlled by law enforcement" (D.I. 19 at 14) is puzzling because that seems to be little, if anything, more than the definition of custodial interrogation.  Of course the environment was controlled by law enforcement, but that only establishes that there is an issue to discuss; it does nothing to answer the issue.  As to the assertions that Agent Hughes asked the defendant questions that had an investigatory purpose and gathered information to use as a psychological ploy to induce a waiver (*id.* at 15), those issues at most might lead to the suppression of evidence of the information given in response to those specific pre-*Miranda* questions, but they do not establish that the later waiver was involuntary.

Regarding the creation of a sense of urgency to cooperate and causing nervousness by noting potential outcomes of a detention hearing and trial, a portion of that discussion was touched off by the defendant's own question to Agent Hughes. Looking at the papers the agent had with him, the defendant asked, "What's all of that?" (Def. Ex. 1 at 4.)  The agent then responded, "[i]t's your criminal record here ... and it doesn't look very positive."  (*Id.*)  He then used that as a launching point to describe the

15

legal consequences of the probable charge the defendant faced. (*Id.*) That description, regardless of whether it turns out to have been well-founded, was not such that it could be said to have defeated the defendant's capacity to judge whether or not he wished to waive his right to silence. In all, the time that Agent Hughes spent talking to the defendant about the charges he faced and their potential consequences took something like five minutes, and neither that length of time nor the tone or content of the agent's remarks amount to a browbeating or an otherwise improper undermining of the defendant's will.

As to the defendant's complaint that the agent intimidated him by the single remark, "look at me while I'm talking to you," and that the mention of his family was an overwhelming psychological ploy (D.I. 19 at 15, 18-19), the totality of the circumstances again belie that contention. The defendant is a thirty-three year old man with an 11th or 12th grade education and, sadly but significantly, experience in the criminal justice system. (*See* Def. Ex. 1 at 4 (noting that the defendant has previously been convicted of felony offenses); Tr. at 74 (noting that the defendant had previously been convicted of drug offenses).) He did not wilt in the face of the review of his background information or the rest of the pre-*Miranda* statements made by the agent. No promises were made to him except that his cooperation would be made know to prosecutors. (Def. Ex. 1 at 5.) The waiver form was read to him, and he signed it. (*Id.* at 5-6.) He knew how to say he wanted time to think things over. He had already done that, in effect, when he had earlier said he was not sure he wanted to make any statements. (*See* Tr. at 18.) Presumably he knew how to say "no," as well. But he

16

chose instead to say, "yes," and to make the statements he now wishes he had not.

His present remorse does not, however, transform his consent into anything other than

that which it appears on this record to have been: namely, a knowing, intelligent, and

voluntary waiver of the right to remain silent.  He was not coerced, and his voluntary

statements are admissible

## V.  Conclusion

Accordingly, it is hereby ORDERED that the defendant's Motion to suppress (D.I.

11) is DENIED.

_____
UNITED STATES DISTRICT JUDGE

January 30, 2006
Wilmington, Delaware

17